**Electronically Filed
Intermediate Court of Appeals
CAAP-14-0000391
20-FEB-2018
09:20 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
SHAWN D. VISINTIN, Defendant-Appellant

NO. CAAP-14-0000391

APPEAL FROM THE CIRCUIT COURT OF THE FIFTH CIRCUIT
(CR. NO. 13-1-0166)

FEBRUARY 20, 2018

LEONARD and GINOZA, JJ.
WITH NAKAMURA, C.J., CONCURRING AND DISSENTING SEPARATELY

OPINION OF THE COURT BY GINOZA, J.

Defendant-Appellant Shawn Daniel Visintin (**Visintin**) appeals from his conviction for the offense of Place to Keep Pistol or Revolver, in violation of Hawaii Revised Statutes (**HRS**) § 134-25 (2011), in the Circuit Court of the Fifth Circuit (**circuit court**). Visintin was convicted pursuant to a conditional no contest plea, which allowed him to pursue this appeal.[1]

---

[1] The Honorable Randal G.B. Valenciano presided.

On August 7, 2012, Visintin was arrested for the offense of Place to Keep Pistol, and on the same date, he secured a bond for bail that had been set at $10,000. Visintin was issued a "Bail/Bond Receipt, Acknowledgment, and Notice to Appear" (**BBRA**), which stated he was to appear at the District Court of the Fifth Circuit (**district court**) on September 5, 2012. As of September 5, 2012, Plaintiff-Appellee State of Hawai'i (**State**) had not filed any charge against Visintin and thus, on that date, the State contends that the district court discharged Visintin's bail bond as part of its "calendar call" procedure. Visintin was not present at the September 5, 2012 proceeding and the record does not reflect any documents discharging Visintin's bail bond or that he was notified that his bail bond had been discharged.

Almost nine months after Visintin's arrest and the posting of his bail bond, and after he had returned to his home in Montana, the State issued an Indictment charging him with the offenses of Place to Keep Pistol or Revolver, in violation of HRS § 134-25 (2011) (**Count 1**), and Unregistered Firearm, in violation of HRS §§ 134-3(a) (2011) and 134-17(b) (2011) (**Count 2**). A bench warrant was also issued for Visintin's arrest.

After being arrested in Montana pursuant to a fugitive complaint but then being released, Visintin voluntarily returned to Hawai'i for arraignment on the charges. He subsequently filed a "Motion to Suppress Evidence Based on Illegal Stop, Illegal Detention, Illegal Interrogation, Illegal Search, and Illegal Arrest" (**Motion to Suppress**). He also filed a "Motion to Dismiss Based on Rule 48, Speedy Trial, Right to Bail and Due Process" (**Motion to Dismiss**), alleging that his right to a speedy trial, right against excessive bail, and due process rights had been violated. The circuit court denied both the Motion to Suppress and the Motion to Dismiss.

Visintin subsequently entered a conditional plea under which he pled no contest to the Place to Keep Pistol or Revolver

2

charge, and the Unregistered Firearm charge was dismissed. Under the conditional plea, Visintin was allowed to appeal the denial of his motions.

On appeal, Visintin argues that the circuit court erred by:

(1) denying his Motion to Dismiss because: (a) the delay in bringing him to trial after his arrest and setting of bail violated his right to a speedy trial under Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 48; (b) his right to a speedy trial under the Sixth Amendment to the United States Constitution or article I, section 14 of the Hawaiʻi Constitution was violated; and (c) his right against excessive bail was violated; and

(2) denying his suppression motion because the arresting officer lacked reasonable suspicion to detain him and request his identification.

We hold that under HRPP Rule 48, the six-month time period for commencing Visintin's trial began to run when he was arrested and bail was set on August 7, 2012. Although the State contends that Visintin's bail bond was discharged pursuant to the calendar call procedure such that the time from the bail bond discharge until filing of the Indictment should be excluded, the record does not show that Visintin was notified that his bail bond was discharged. Given the circumstances in this case, we conclude that the time requirement under HRPP Rule 48 was exceeded. However, we conclude that Visintin's constitutional speedy trial rights were not violated, and that his demand for dismissal based on his claim of excessive bail is unwarranted.

We further hold that the arresting officer had reasonable suspicion at the time he initially stopped Visintin, and the officer's request for Visintin's identification was proper. Thus, the circuit court properly denied Visintin's Motion to Suppress.

The case is remanded to the circuit court for dismissal under HRPP Rule 48. On remand, the circuit court must determine

whether to dismiss with or without prejudice, in the circuit court's discretion.

I.  **Background**

    A.  **Events on August 7, 2012 and Visintin's Arrest**

On August 7, 2012, Officer Brian Silva (**Officer Silva**) was on duty in his patrol car driving southbound on Kuhio Highway, entering the Kawaihau District of Kauaʻi.  Officer Silva stated that there had been "a lot of calls of burglaries and criminal activity" in the area in which he was patrolling prior to that date, but he could not name any specific incidents and was not responding to any report of criminal activity in progress at that time.

At approximately 2:40 AM, as he approached an institution known as the Friendship House,[2] Officer Silva "saw a figure of a person running across the street from the ocean side . . . into the area of the entrance into the Friendship House." Visintin was the individual in question.  Officer Silva turned on his vehicle's spotlight and began to turn into the driveway of the Friendship House where he had seen Visintin running.  Officer Silva described his spotlight as "very bright."  Using his spotlight, Officer Silva saw Visintin "lowered into the bushes" next to the driveway.  Officer Silva stated that he wanted to see what Visintin was doing "hiding in the bushes" and that he "obviously was trespassing" by doing so.  Officer Silva then activated his patrol car's blue cruise lights; Officer Silva estimated that there was "[m]aybe a second" between the time he turned on his spotlight and the time he activated his cruise lights.

At the time he activated his spotlight, Officer Silva had determined that he wanted to "check it out," see what was going on, and request identification.  Officer Silva stated that the recent burglaries and the fact that the Friendship House

_____

[2]  Officer Silva described the Friendship House as a facility providing counseling.

4

appeared to be closed factored into his decision to stop and request identification from Visintin, but that he still would have checked it out, even in the absence of the burglary reports. Additionally, Officer Silva testified that the fact that Visintin ran across the road "alarmed [him] a little bit more than a regular person[,]" but that he still would have stopped Visintin, even if he had walked across the road. Officer Silva had not heard of Visintin prior to their encounter on August 7, 2012, had no warrant to arrest or search him, and had no report that Visintin or anyone matching his description had engaged in any illegal activity.

After turning on his cruise lights, Officer Silva immediately exited his vehicle and ordered Visintin to come out of the bushes. Visintin cooperated. As Visintin approached him, Officer Silva noted that Visintin was breathing heavily, sweating a lot, and that he could smell alcohol coming from Visintin's facial area. Officer Silva took these considerations into account when approaching Visintin.

Officer Silva then requested identification from Visintin. Officer Silva agreed that one of the things he intended to do with Visintin's identification was to run a warrant check. Upon Officer Silva's request for identification, Visintin reached into his wallet and produced a Montana driver's license. While Visintin was getting his driver's license, Officer Silva observed a concealed weapons permit underneath the clear plastic in the wallet. This caused Officer Silva to suspect that Visintin possibly had a firearm on his person, and Officer Silva asked Visintin whether he had any weapons or "anything that might hurt me[.]" Visintin responded that he had a handgun, and Officer Silva conducted a pat down and found an unloaded Rock Island semi-automatic .45 caliber handgun in the waistband of Visintin's pants. Even if Visintin had not responded to his question, Officer Silva stated he "still would have patted him down for officer safety." After retrieving the

5

handgun, Officer Silva advised Visintin that he was under arrest for "Place to Keep" and advised him of his constitutional rights.[3]

### B. Events After Visintin's Arrest

Incident to his arrest on August 7, 2012, Visintin's bail was set at $10,000. He paid approximately $1,000 for a bail bond that was posted the same day as his arrest. A BBRA signed by Visintin on August 7, 2012, indicated a charge for "Place to Keep Pistol" and referenced an arrest report number. The BBRA also directed Visintin to appear in district court on September 5, 2012.

On August 31, 2012, Visintin's counsel inquired via email with the assigned Deputy Prosecuting Attorney (**DPA**) as to whether a complaint would be filed and whether the matter would proceed on September 5, 2012. The DPA responded by email that her office had "not received the reports, so therefore no Complaint has been filed." As asserted by Visintin in his Motion to Dismiss,[4] and not disputed by the State,

> By the September 5, 2012 court date . . . the [State] had not filed a Complaint or any other document related to the case.
>
> [A]s of September 5, 2012[,] the State had not charged [Visintin] with any crime. The State did not file any sort of Motion to modify [Visintin's] bail status. The State provided no notice to [Visintin] that the bail bond he posted would or would not be discharged. [Visintin] was given no notice that there would be any change to his bail status. [Visintin] was not given an opportunity to be heard as to whether his bail should be changed, or his speedy trial rights derailed, or whether any ensuing delay was based on good cause.

A video recording in the record reflects that Visintin did not appear before the district court at the September 5, 2012

---

[3] Visintin expressed his willingness to waive his rights and give a statement. In his statement, Visintin told Officer Silva that he had been out drinking with friends earlier, he had crossed the street looking for his friends, and he had gotten scared and hid in the bushes when Officer Silva approached. As to the handgun, Visintin stated that it was his gun but that he was not carrying it on purpose and thought he had left it in his backpack.

[4] In support of Visintin's Motion to Dismiss, Visintin's counsel attested that "[t]he facts, as set forth in the Motion are true and correct to the best of my knowledge and belief."

proceeding, but that his case was among others that were called pursuant to the court's calendar call system. During this court session, the district court announced that for individuals called by the court, charges had not yet been filed and they were free to go, any cash bail posted would be refunded, and any bail bonds would be discharged. Visintin contends, and it is not disputed by the State, that his bail bond was apparently returned to the bondsman without notice to him, Visintin did not receive any sort of refund for the $1,000 that he paid to the bondsman to secure the bail bond, and he at some point properly returned to his home in Montana.[5] The record does not contain any document showing a discharge of Visintin's bail bond that had been issued on August 7, 2012.

On April 25, 2013, a Grand Jury returned the Indictment charging Visintin with the offenses of Place to Keep Pistol or Revolver and Unregistered Firearm. The Indictment concerned the conduct for which Visintin had been arrested and posted the bail bond almost nine months earlier.

On April 25, 2013, the same day the Indictment was filed, the circuit court issued a bench warrant for Visintin's arrest and set his bail at $10,000.[6] On April 30, 2013, the DPA sent an email to Visintin's counsel advising him that Visintin had been indicted and that there was a bench warrant for his arrest. The DPA further recommended that Visintin return to Kaua'i from Montana rather than be arrested and extradited. As of May 24, 2013, it appears that Visintin's counsel had not indicated to the DPA whether Visintin would voluntarily return to Hawai'i.

---

[5] The record is unclear when Visintin returned to Montana. Visintin asserted that upon returning to Montana, he had taken "significant steps toward beginning a career as a police [officer][.]" The State disputed Visintin's claims that he was a police officer, was in a police academy, or was teaching any classes at a police academy.

[6] Visintin argued in the circuit court that "the return on the Grand Jury Indictment reveals that the State did not inform the Court that the defendant had previously been admitted to bail." In response, the State argued that upon the Indictment it "did not mention the prior Bail Bond posted because it had been discharged by the Court on September 5, 2012."

On May 31, 2013, the County Attorney of Yellowstone, Montana filed a "Fugitive from Justice Complaint," which stated that a warrant had been issued for Visintin's arrest, that Visintin "fled from justice or has been convicted of crimes in [Hawai'i] and has escaped from confinement or has broken the terms of his bail, probation or parole," and that authorities in the circuit court had requested Visintin's arrest and indicated they would extradite him. Visintin alleged that this fugitive complaint was based on false representations because the fact that he had previously posted bail on the same matter was withheld from the Montana Court. Visintin was arrested by Montana authorities at his parents' home on June 1, 2013, and again posted bail, this time also for $10,000, to secure his freedom during the Montana extradition proceedings. On June 4, 2013, however, the Yellowstone County Attorney moved to dismiss the fugitive complaint "on the grounds that it is not in the interest of justice to pursue." The Montana Court granted the motion, dismissed the case without prejudice, and exonerated Visintin's bond.

On August 1, 2013, Visintin filed in the circuit court a motion to recall the bench warrant and to allow him to return voluntarily to Kaua'i for arraignment, to return to Montana during the pendency of the case, and be released on his own recognizance. The State did not oppose Visintin's motion. On August 6, 2013, the circuit court granted in part and denied in part Visintin's motion, denying him release on his own recognizance but reducing his bail to $100 and allowing Visintin to return to Montana pending the outcome in the case so long as he was present for all court appearances. On August 6, 2013, Visintin filed a waiver of extradition and was arrested and arraigned on Kaua'i. Visintin paid the $100 bail and was released.

C.    **Visintin's Motion to Dismiss**

On August 20, 2013, Visintin filed the Motion to Dismiss, which alleged that his speedy trial rights had been

violated due to the delay in bringing him to trial since his initial arrest, his due process rights were violated, and that seeking and obtaining multiple postings of bail violated constitutional prohibitions on excessive bail.

On September 10, 2013, the circuit court held a hearing on the Motion to Dismiss. With regard to the HRPP Rule 48 time periods, the parties agreed that the 29-day period between Visintin's initial arrest on August 7, 2012 and his initial court date on September 5, 2012, should be charged to the State. The parties further agreed that the 14-day period between the arraignment on August 6, 2013 to the filing of the Motion to Dismiss on August 20, 2013, was charged to the State. However, the parties disputed the 231-day period from the day after the initial court date (September 6, 2012) to the filing of the Indictment (April 25, 2013).[7]

The State requested the circuit court take judicial notice that the DPA assigned to Visintin's case had been in trial with other cases from December 3, 2012 to December 11, 2012 and from January 7, 2013 to March 6, 2013. The circuit court took judicial notice that the DPA had been assigned these cases but expressed doubts as to whether this furnished good cause to exclude the time under HRPP Rule 48(c)(8) and noted that administration and assignment of cases was handled within the prosecutor's office. The State additionally requested that the circuit court take notice of the fact that 2012 was an election year for the prosecutor's office, the election was held November 6, 2012, and a new prosecutor took office on December 3, 2012.

Arguments on the Motion to Dismiss primarily centered upon the effect of the circuit court's calendar call procedure on

_____

[7] The parties also contested the 103-day period when Visintin was in Montana between the issuance of the Indictment on April 25, 2013, and Visintin's arraignment on August 6, 2013. The circuit court rejected the State's argument that this period was excludable under HRPP Rule 48(c)(5), finding that Visintin was free to leave Hawai'i and thus did not make himself unavailable as asserted by the State. The State reserved the right to challenge the ruling on this second contested period. However, because the Motion to Dismiss ultimately turns upon whether the 231-day contested period counts toward the HRPP Rule 48 time requirement, this second contested period is rendered immaterial and we need not address it.

the 231-day contested period. To explain this procedure, the State called Vera Tabe (**Tabe**), Court Administrator for the circuit court, as a witness. Tabe testified that, as part of her duties, she was familiar with the calendar call list,[8] which had been in place the entire time she had been a court administrator, a period of over ten years. Tabe testified that the first step of the procedure was the generation of a calendar call list, which she described as an internal document listing defendants who had been arrested, given a court date, and posted bail or bond or been released on their own recognizance, but for whom a complaint had not yet been filed by the prosecutor's office.[9]

Tabe explained that this list was generated by the court's receipt of defendants' BBRA forms. Tabe testified that the Kaua'i Police Department would send the original BBRA to the court, while a copy would be forwarded to the defendant. According to Tabe, after the court receives a BBRA, it is file-stamped without a case number,[10] and then it is placed in a pending file (actually a lateral drawer) for the assigned court date. A criminal number is not attached to a BBRA until a complaint is filed by the prosecutor's office.

Tabe testified that, at the time of the court date indicated on the BBRA, the cases on the calendar call list are called "first thing in the morning by the Judge" prior to the court's normal calendar. In addressing the calendar call cases, the judge would "read the list of names of the defendants [] and indicate that no formal charges ha[d] been filed against them by the prosecutor's office, but in the future if they do proceed, they will be served with documents to appear when and where."

_____

[8] During her testimony, Tabe sometimes referred to the procedure as the "call list" or "call calendar." For consistency, we will refer to it as the calendar call list.

[9] Tabe explained that in order for a case to be placed on the regular calendar, a complaint "need[ed] to be filed at least a week prior to the court date" and that cases in which this did not occur would be placed on the calendar call list.

[10] We note that the BBRA issued for Visintin on August 7, 2012 does not appear to have a file stamp.

Tabe testified that the court does not consider it a failure to appear if a defendant does not appear for the calendar call, and there are no consequences for not appearing for the calendar call proceeding.

Tabe further testified that after the cases on the calendar call list are called, the court retains the original BBRAs. For defendants who have paid cash bail, the judge issues an unfiled order so that the defendant can go to the court's fiscal window to receive a refund of the amount paid. With regard to a defendant who posted a bail bond, Tabe testified that the judge "discharges the bond" and after the judge discharges it the defendant is no longer under the bond. The following testimony was also given:

Q:  And -- and in a case where it's a bond posted, the bond is simply automatically sent back to the bonding company?
A:  We don't. We keep the original BBRA, the original bond. The bond is just discharged.
Q:  Okay.
A:  So there is nothing more on that bond for that defendant.
Q:  Okay. Is there a record kept of the time that the bond is discharged?
A:  It would be just what's noted in the court proceeding on that hearing date.
Q:  Is the time of the bond discharge noted in the file?
A:  No.
Q:  Okay.
A:  Because we don't have any case file.

Tabe noted that a criminal number can only be assigned to a case once an initial charging document is filed. Without a criminal number or a complaint, Tabe agreed that there was no way that a dismissal could be filed. To that end, Tabe stated that, to her knowledge, the prosecutor's office had never attempted to request a written dismissal for a case on the calendar call list. However, Tabe acknowledged that defendants routinely filed motions for permission to travel under the BBRA number. Tabe further testified that the State does not make any showing of good cause for not filing a complaint in a case on the calendar call list, the court makes no order as to whether speedy trial rights are tolled after a case appears on the calendar call list, and there are no means for a defendant to object to a bail bond being discharged during the calendar call proceeding.

After Tabe's testimony, Visintin argued that HRPP Rule 48 and constitutional speedy trial jurisprudence provide that the speedy trial clock begins once the defendant is arrested and bail is set, and that the State's argument seeks "to judicially insert language into Rule 48 that says if bail is somehow unset, regardless of notice to the defendant, that that tolls the rule." Visintin further argued that the goals of HRPP Rule 48 "would be subverted if the State is permitted, even after an arrest . . . and a bail setting . . . to simply not show up, not file their papers on time, and somehow effect this de facto dismissal without prejudice."

In response, the State noted that for cases on the calendar call list, no charges are filed at the time of the initial court date, and the calendar call process causes any bail or bond to be discharged or returned, effectively extinguishing the case. Therefore, the State argued that the calendar call procedure acted as a *de facto* dismissal, which caused the period between the calendar call and the Indictment to be excluded under HRPP Rule 48(c)(6). The State further argued that if this time was not excludable under (c)(6), it was excludable for good cause under (c)(8) because under the court's calendar call system, there was no means for the State to dismiss the case.

The circuit court ultimately denied Visintin's Motion to Dismiss, ruling that:

> The purpose of the call list calendar is to get cases on calendar so that defendants who have been arrested know that their case is not active and is being dismissed. . . . So based on that, what the Court is finding is that the period of September 6th to April 25th is an excludable period pursuant to Rule 48(c)(6).

The circuit court directed the DPA to prepare a written order for its denial of the Motion to Dismiss. However, no written order was entered memorializing the circuit court's oral orders, and these oral orders did not specifically address Visintin's arguments concerning his constitutional speedy trial right or his right against excessive bail.

D.   **Visintin's Motion to Suppress Evidence**

On August 15, 2013, Visintin filed the Motion to Suppress, which sought to suppress "any and all evidence acquired

12

subsequent to Kauai Police Department Officer Brian Silva's initial contact with Mr. Visintin on August 7, 2012."

At the hearing on the Motion to Suppress, also held on September 10, 2013, the circuit court heard the testimony of Officer Silva concerning the circumstances of Visintin's arrest. In its argument, the State contended that Officer Silva's request for identification was reasonable based on observing "somebody run across the roadway and end up hiding in the bushes of a closed business at . . . 2:40 in the morning" and that Officer Silva's pat down was reasonable given Visintin's admission that he had a firearm. In response, Visintin argued that the issue turned on the constitutionality of the stop, that the mere act of crossing the road did not furnish the necessary reasonable suspicion that criminal activity was afoot to justify this stop, and that his action of crouching in the bushes was not incriminating but rather a natural response to having the bright spotlight shined upon him.

The circuit court orally denied the Motion to Suppress, finding that "it was a late-night situation[,]" and the facilities in the area were isolated and closed for business. The circuit court further found that Officer Silva observed Visintin "running across the highway into the Friendship House area[,]" and stated that "[a]t the very minimum, there's trespass issues." Finally, the circuit court found that Visintin was "hiding" in the bushes and that these "circumstances would indicate that these are facts -- specific and articulable facts . . . that there could be criminal activity afoot." As to the firearm, the circuit court noted that Officer Silva observed Visintin's concealed firearm permit, questioned him whether he had a firearm, Visintin responded in the affirmative, and Officer Silva seized the firearm.[11]

---

[11] The State also argued that the firearm would have been inevitably discovered and requested a ruling on this issue. In response, the circuit court found that Officer Silva would have conducted a pat down even if Visintin had not stated he had a gun, and thus "the weapon would have been
(continued...)

13

Although the circuit court directed the DPA to prepare an order, no written order was entered on the Motion to Suppress.

### E. Visintin's Conditional Plea

On September 16, 2013, Visintin entered the conditional no contest plea on Count 1, reserving the right to appeal any pre-trial rulings. As part of the plea, the State dismissed Count 2. Based on the pleas, the circuit court entered its Judgment on January 30, 2014, sentencing Visintin to five years of probation; sixty days imprisonment, in addition to time served; and a $205 crime victim compensation fee and $150 probation services fee. Visintin's sentence was stayed pending appeal. Visintin timely filed a notice of appeal.

## II. Standards of Review

### A. HRPP Rule 48

The Hawai'i Supreme Court has recognized that:

> When reviewing a trial court's denial of an HRPP Rule 48 motion to dismiss, we apply both the "clearly erroneous" and "right/wrong" tests:
>
> > A trial court's findings of fact (FOFs) in deciding an HRPP Rule 48(b) motion to dismiss, are subject to the clearly erroneous standard of review.... However, whether those facts fall within HRPP Rule 48(b)'s exclusionary provisions is a question of law, the determination of which is freely reviewable pursuant to the "right/wrong" test.

State v. White, 92 Hawai'i 192, 198, 990 P.2d 90, 96 (1999) (citation omitted).

### B. Constitutional Speedy Trial Right

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." Haw. Const. art. I, § 14. The sixth amendment to the United States Constitution similarly provides that an accused in a criminal prosecution "shall enjoy the right to a speedy and public trial . . . ." The constitutional speedy trial right is "a fundamental right afforded to a criminal defendant." White, 92 Hawai'i at 201, 990 P.2d at 99. The determination of whether this right has been

(...continued)
discovered even if Mr. Visintin didn't turn it over."

14

violated is a conclusion of law which we review *de novo*. <u>State v. Lau</u>, 78 Hawai'i 54, 58, 890 P.2d 291, 295 (1995).

### C.    Motion to Suppress

We review the circuit court's ruling on the Motion to Suppress *de novo* to determine whether the ruling was right or wrong. <u>State v. Eleneki</u>, 106 Hawai'i 177, 180, 102 P.3d 1075, 1078 (2004) (citation omitted).

> The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution.

<u>State v. Spillner</u>, 116 Hawai'i 351, 357, 173 P.3d 498, 504 (2007).

> Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/wrong standard.

<u>State v. Balberdi</u>, 90 Hawai'i 16, 20-21, 975 P.2d 773, 777-78 (App. 1999) (quoting <u>State v. Anderson</u>, 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997)).

## III. Discussion

### A.    Motion to Dismiss

Visintin challenges the circuit court's denial of his Motion to Dismiss, arguing that dismissal was mandated under HRPP Rule 48, his constitutional speedy trial right, and his right to be free from excessive bail. We address each argument in turn.

#### 1.    HRPP Rule 48

We first address the circuit court's ruling under HRPP Rule 48, which provides in relevant part:

> **Rule 48. Dismissal.**
>
> (a) *By prosecutor.* The prosecutor may by leave of court file a dismissal of a charge and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.
>
> (b) *By court.* Except in the case of traffic offenses that are not punishable by imprisonment, <u>the court shall, on</u>

motion of the defendant, dismiss the charge, with or without
prejudice in its discretion, if trial is not commenced
within 6 months:

> (1) **from the date of arrest if bail is set**
> or from the filing of the charge, whichever is
> sooner, on any offense based on the same conduct
> or arising from the same criminal episode for
> which the arrest or charge was made; or
>
> (2) from the date of re-arrest or re-filing of the
> charge, in cases where an initial charge was dismissed upon
> motion of the defendant; or
>
> (3) from the date of mistrial, order granting a new
> trial or remand, in cases where such events require a new
> trial.
>
> . . .
>
> (c)  *Excluded periods.* The following periods shall be
> excluded in computing the time for trial commencement:
>
> > (1) periods that delay the commencement of trial and
> > are caused by collateral or other proceedings concerning the
> > defendant, including but not limited to penal
> > irresponsibility examinations and periods during which the
> > defendant is incompetent to stand trial, pretrial motions,
> > interlocutory appeals and trials of other charges;
> >
> > . . .
> >
> > (5) periods that delay the commencement of trial
> > and are caused by the absence or unavailability of the
> > defendant;
> >
> > (6) the period between a dismissal of the charge
> > by the prosecutor to the time of arrest or filing of a
> > new charge, whichever is sooner, for the same offense
> > or an offense required to be joined with that offense;
> > [and]
> >
> > . . .
> >
> > (8) other periods of delay for good cause.
>
> (d)  *Per se excludable and includable periods of time for
> purposes of subsection (c)(1) of this rule.*
>
> > (1) For purposes of subsection (c)(1) of this rule,
> > the period of time, from the filing through the prompt
> > disposition of the following motions filed by a defendant,
> > shall be deemed to be periods of delay resulting from
> > collateral or other proceedings concerning the defendant:
> > motions to dismiss, to suppress, . . . .

(Emphasis added.)

"HRPP Rule 48 is intended to 'ensure an accused a
speedy trial, which is separate and distinct from [the]
constitutional protection to a speedy trial.'"  State v. Fukuoka,

141 Hawai'i 48, 55, 404 P.3d 314, 321 (2017) (quoting State v. Estencion, 63 Haw. 264, 268, 625 P.2d 1040, 1043 (1981)); State v. Coyaso, 73 Haw. 352, 355-56, 833 P.2d 66, 68 (1992) (The purpose of HRPP Rule 48 "is broader than the constitutional right to a speedy trial as found in the sixth amendment of the U.S. Constitution and article I, § 14 of the Hawaii Constitution.")

> [U]nder HRPP Rule 48, a court must dismiss the charges upon the defendant's motion when trial has not commenced within six months from the date of arrest if bail is set or from the filing of the charge, whichever is sooner, taking into account any periods of delay excluded under the rule.

Fukuoka, 141 Hawai'i at 55, 404 P.3d at 321; State v. Hoey, 77 Hawai'i 17, 28, 881 P.2d 504, 515 (1994).

In this case, the parties agree that the 29-day period between August 7, 2012 (arrest and bail setting) to September 5, 2012 (initial court date) are charged to the State. The parties dispute whether to include the 231-day period between September 6, 2012 (day after initial court date) to April 25, 2013 (Indictment). The parties agree that the 14-day period between August 6, 2013 (arraignment) and August 20, 2013 (filing of Motion to Dismiss) are charged to the State.[12] Given these circumstances, the dispositive issue is whether the 231-day contested period should be charged to the State.

The State argues that it did not exceed the HRPP Rule 48 six-month deadline and that the 231-day contested period should be excluded under HRPP Rule 48(c)(6) because the calendar call procedure on September 5, 2012, acted as a de facto dismissal. Alternatively, the State argues that under HRPP Rule 48(c)(8), the inability to dismiss the case and other factors provided good cause for its delay. The circuit court agreed with the State's first argument, reasoning that the purpose of the calendar call list is to advise defendants who have been arrested that their case is not active and "is being dismissed" and thus

---

[12]  Because Visintin filed his Motion to Suppress on August 15, 2013 (five days before he filed his Motion to Dismiss), it appears that only nine (9) days should be charged to the State during this time period. See HRPP Rule 48(c)(1) and (d)(1).

17

the 231-day contested period was excludable under Rule 48(c)(6).

Visintin argues that treating the calendar call procedure as a *de facto* dismissal is contrary to the language and policy of HRPP Rule 48. He further contends that there was no good cause to exclude the 231-day contested period. Thus, he argues that the circuit court erred in denying his Motion to Dismiss under HRPP Rule 48.

In this case, Visintin was arrested and bail was set on August 7, 2012, thus triggering the time to run under HRPP Rule 48(b)(1). The record does *not* reflect that Visintin was provided notice that the bail bond he posted on August 7, 2012 was discharged or that there was a change to his bail status. Given the plain language of HRPP Rule 48(b)(1) and the record in this case, we conclude that the calendar call procedure did not stop the HRPP Rule 48 time from running.

During the calendar call procedure, as established in the record herein, the district court called out the name of individuals on the calendar call list (including Visintin) and verbally announced that those individuals may go, that cash bail posted will be refunded, and that bail bonds will be discharged. However, Visintin did not appear at the September 5, 2012 proceeding and he asserted -- with the supporting declaration of his counsel and without dispute from the State -- that the State did not give him notice that his bail status would be or had been changed.[13]

Under HRPP Rule 48(b), the trial court must "dismiss the charge, with or without prejudice in its discretion, if trial is not commenced within six months . . . from the date of arrest if bail is set[.]" (Emphasis added). The Hawai'i Supreme Court has recognized generally that HRPP Rule 48 is "derived from the ABA Standards [for] Criminal Justice, in particular, Part II of the chapter setting forth standards relating to speedy trial." State v. White, 92 Hawai'i 192, 199, 990 P.2d 90, 97 (1999)

---

[13] The record is unclear why Visintin did not appear on September 5, 2012. We note that his counsel inquired and was told prior to that date that no charge had been filed.

(quoting <u>State v. Jackson</u>, 81 Hawai'i 39, 53, 912 P.2d 71, 85 (1996)).[14]  In turn, specifically as to HRPP Rule 48(b)(1), the Hawai'i Supreme Court has relied upon § 12-2.2(a) of the American Bar Association Standards for Criminal Justice, (2d ed. Supp. 1986) for purposes of determining when the speedy trial clock begins to run.  <u>Id.</u>

The applicable version of § 12-2.2(a) of the ABA Standards for Criminal Justice (2d ed. Supp. 1986), in place when HRPP Rule 48(b)(1) was amended in 2000,[15] stated:

> Standard 12-2.2.  When time commences to run
>
> The time for trial should commence running, without demand by the defendant, as follows:
>
> (a) from the date the charge is filed, <u>except that if the defendant has been continuously held in custody or **on bail or recognizance**</u> until that date to answer for the crime or a crime based on the same conduct or arising from the same criminal episode, <u>then the time for trial should commence running from the date the defendant was **held to answer**</u>[.]

(Emphasis added.)

---

[14] Effective as of July 1, 2000, HRPP Rule 48 (b)(1) was amended to add the language "if bail is set."  <u>See</u> Order Amending the Hawai'i Rules of Penal Procedure (Feb. 4, 2000).  Even before the 2000 amendment –– when HRPP Rule 48(b)(1) stated that the time began to run "from the date of the arrest or from the filing of the charge, whichever is sooner" –– the Hawai'i Supreme Court interpreted the rule consistent with the ABA Standards for Criminal Justice related to speedy trials.  <u>See</u> <u>State v. Johnson</u>, 62 Haw. 11, 12, 608 P.2d 404, 405 (1980)(holding that where the defendant was arrested but released within twenty-four hours without charges being filed, the investigatory arrest did not trigger HRPP Rule 48(b)(1)); <u>State v. Provard</u>, 63 Haw. 536, 538, 631 P.2d 181, 183 (1981)(noting that in <u>Johnson</u>, the court held that "if a defendant is released *outright* some time after arrest but thereafter is charged with the same offense for which he was arrested and held to answer, the time runs from the date of the filing of the charge.")(emphasis added).
  As noted above, the parties in this case do not dispute that the 29-day period between August 7, 2012 (arrest and bail setting) to September 5, 2012 (initial court date) is charged to the State.  We agree with the parties' treatment of this period.  Unlike the individual in <u>Johnson</u>, Visintin was not released outright after a twenty-four hour investigatory arrest.  Rather, he was undisputedly subject to bail conditions for the 29-day period between August 7, 2012, and September 5, 2012.

[15] We note that in 2004, a third edition of the ABA Standards for Criminal Justice, Speedy Trial and Timely Resolution of Criminal Cases was adopted, which includes substantial revisions to Part II and § 12-2.2(a).  <u>See</u> ABA Standards for Criminal Justice: Speedy Trial and Timely Resolution of Criminal Cases (3d ed. 2006) (commentary added).  However, because the current version of HRPP Rule 48 was last amended in 2000, we are guided in this case by the earlier version of § 12-2.2(a).

As recognized in this § 12-2.2(a) ABA standard, the setting of bail or recognizance is equivalent to being "held to answer[.]"  In other words, a person on bail or recognizance is not "released outright."  See generally Provard, 63 Haw. at 538, 631 P.2d at 183.  Thus, in this case, where the record establishes that Visintin was arrested and bail was set on August 7, 2012, but the record does not establish that he was notified that his bail was discharged, we conclude the effect is that he reasonably believed he was still "held to answer" for the offense asserted upon his arrest.  As noted in the commentary for § 12-2.2(a) of the ABA Standards for Criminal Justice,

> where the defendant is held to answer until the time the charge is filed, it is appropriate to begin counting the speedy trial time from the former event, as the right to speedy trial is intended to prevent long periods of detention, conditional release, personal anxiety, and public suspicion.

ABA Standards for Criminal Justice, § 12-2.2(a) cmt. at 12-21 (2d ed. Supp. 1986) (emphasis added).

We also conclude that the district court's calendar call procedure should not be construed as a de facto dismissal of the charge, and thus, does not trigger excludable time under HRPP Rule 48(c)(6).  In our view, treating the calendar call procedure as a de facto dismissal is contrary to the requirements of HRPP Rule 48.  HRPP Rule 48(a) directly addresses dismissals and provides that "[t]he prosecutor may by leave of court file a dismissal of a charge and the prosecution shall thereupon terminate.  Such a dismissal may not be filed during the trial without the consent of the defendant."  (Emphasis added.)  For the calendar call procedure, there is no "charge" to be dismissed.  Moreover, the record reflects that nothing was "filed" as part of the calendar call procedure.  HRPP Rule 49(f) provides, in relevant part:

> (f) Filing. The conventional filing of motions and other documents with the court shall be made by filing them with the clerk of the court, except that the judge may permit the documents to be filed with the judge, in which event the judge shall note thereon the filing date and forthwith transmit them to the office of the clerk.

(Emphasis added); see also *File*, Black's Law Dictionary, (10th ed. 2014)(defining "file" as "[t]o deliver a legal document to the court clerk or record custodian for placement into the official record[.]"). Under HRPP Rule 48(a), a dismissal of a charge by a prosecutor should thus include a document filed with the court. However, based on our record, the calendar call procedure in this case did not involve the filing of any document with the court, whether for a purported dismissal or otherwise.

Finally, we do not agree with the State's alternative ground that there was good cause under HRPP Rule 48(c)(8) to exclude the 231-day contested period. In this regard, the State argues that the Fifth Circuit's calendar call procedure "precludes the State from filing a dismissal of the district court case if a Complaint is not filed by the defendant's first appearance date" and that "[i]t would be absurd for the time period when a defendant is released outright to be included in [the HRPP] Rule 48 calculation." Although we agree that there is no existing charge to dismiss under the calendar call procedure, the record in this case does not reflect that Visintin was released outright and that he was so informed. Under the circumstances of this case, the State has not shown good cause under HRPP Rule 48(c)(8) to exclude the 231-day contested period.

Given the particular circumstances in this case, we conclude that the 231-day contested period between September 6, 2012 (day after the initial court date) and April 25, 2013 (filing of the Indictment) must be charged to the State.[16] Thus, under HRPP Rule 48, the circuit court was required to dismiss the charges against Visintin. On remand, the circuit court must determine whether to dismiss the charges with or without prejudice, in the circuit court's discretion.

## 2. Constitutional Speedy Trial Right

Visintin also claims that the delay in bringing him to trial violated his constitutional right to a speedy trial under

---

[16] We limit our ruling to the circumstances in this case and do not reach the question of the type of notice that must be given to a defendant when he or she is released or discharged from bail.

the sixth amendment to the United States Constitution and article I, seciton 14 of the Hawai'i Constitution. Unlike a violation of HRPP Rule 48 which requires dismissal with or without prejudice in the trial court's discretion, a violation of a defendant's constitutional right to a speedy trial requires dismissal *with* prejudice. State v. Lau, 78 Hawai'i 54, 62, 890 P.2d 291, 299 (1995) (citations omitted).

We conclude that Visintin's constitutional right to a speedy trial was not violated. The circuit court did not explicitly address this issue, but implicitly rejected it by denying Visintin's Motion to Dismiss.

We analyze whether the constitutional speedy trial right has been violated "by applying the four-part test articulated in [Barker v. Wingo, 407 U.S. 514 (1972).]" White, 92 Hawai'i at 201, 990 P.2d at 99 (internal footnote and citation omitted). "The four Barker factors are: (1) length of delay; (2) the reasons for the delay; (3) the defendant's assertion of his or her right to speedy trial; and (4) prejudice to the defendant." Id. at 201-02, 990 P.2d at 99-100 (citation omitted). Due to the "unusually amorphous" nature of the constitutional speedy trial right and "the separate, often conflicting interests of the accused and of the public in the speedy disposition of cases, the weight accorded each of these factors is to be determined on an *ad hoc* basis." Lau, 78 Hawai'i at 62, 890 P.2d at 299 (citation omitted). "None of these four factors is to be regarded as either a necessary or sufficient condition to the finding of a deprivation of the right to a speedy trial, but rather they are related factors and must be considered together with such circumstances as may be relevant." Id. (citations and internal quotation marks omitted).

First, we must determine when the constitutional speedy trial clock began to run. As recognized by the Hawai'i Supreme Court, "it is either a formal indictment, or information, or else the actual restraint imposed by arrest and holding to answer a criminal charge that engages the particular protections of the

22

speedy trial provision of the Sixth Amendment." White, 92 Hawaiʻi at 202, 990 P.2d at 100 (citations and brackets omitted) (emphasis added). The supreme court distinguished between an investigatory arrest and an arrest where a defendant is "held to answer" for a criminal charge. Id. The court analyzed its ruling in Johnson, 62 Haw. 11, 608 P.2d 404 and noted that "this court implicitly recognized that an investigatory arrest did not amount to an arrest as a result of which a defendant was 'held to answer' for a criminal offense." Id.

When no indictment is outstanding, it is the "actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." United States v. Marion, 404 U.S. 307, 320 (1971) (emphasis added). The right to a speedy trial is "designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the lesser, but nevertheless substantial, impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges." United States v. MacDonald, 456 U.S. 1, 8 (1982).

In this case, Visintin was not simply released after being arrested by the police, but was released upon posting a bail bond. Visintin's arrest was not an investigatory arrest, but rather more akin to an arrest where he was held to answer for a criminal charge. Further, although he was not charged by the time of his initial court date twenty-nine days later, and the State contends that his bail bond was discharged via the calendar call procedure, the record does not show that the State notified Visintin that his bail bond had been discharged. Under these circumstances, as discussed earlier, Visintin reasonably understood that he was still being "held to answer" for the offense for which he was arrested. Indeed, although the circumstances leading to his arrest in Montana remain unclear, officials in Montana initially believed that Visintin was a fugitive, which led to his arrest in Montana. We conclude in

this case that the constitutional speedy trial clock began to run following Visintin's arrest and posting of bail on August 7, 2012.

A little over twelve months elapsed between Visintin's arrest and posting of bail on August 7, 2012, to the filing of his Motion to Dismiss on August 20, 2013. This is a sufficient time period to "warrant an inquiry into the other Barker factors." Lau, 78 Hawai'i at 63, 890 P.2d at 300 (footnote omitted).

With regard to the second factor, we conclude that the reason for the delay weighs slightly in favor of the State. Visintin makes no concrete assertion that the delay in his case was an intentional attempt on the part of the State to hinder his defense. The State explains its delay in seeking an indictment against Visintin by noting the unavailability of the DPA assigned to his case due to her involvement in two other major prosecutions and the change in leadership in the prosecutor's office. While these explanations do not provide overwhelming justifications for the delay, they provide a reasoned basis for the delay and are weighted less heavily. See White, 92 Hawai'i at 203-04, 990 P.2d at 101-02; Lau, 78 Hawai'i at 63, 890 P.2d at 300. Additionally, a portion of the delay (several months) was attributable to the time necessary to bring Visintin back to Hawai'i from Montana, which was reasonable.

For the third Barker factor, we consider whether Visintin asserted his right to a speedy trial. Visintin argues that he "has always demanded a speedy trial" and notes that he "even filed a Motion to enforce it." This comment apparently refers to Visintin's Motion to Dismiss. However, a motion to dismiss for a speedy trial violation does not itself constitute a demand for a speedy trial, unless it is "accompanied in some way by an alternative demand, even if made implicitly, for a speedy trial[.]" Lau, 78 Hawai'i at 64, 890 P.2d at 301 (citation omitted); State v. Wasson, 76 Hawai'i 415, 421, 879 P.2d 520, 526 (1994) ("[I]n the absence of some other indication that a

defendant making a motion to dismiss actually desires a speedy trial, the motion, standing alone, does not weigh in his or her favor.") (citation omitted). Like his Opening Brief, Visintin's Motion to Dismiss asserts that he "has always demanded a speedy trial[,]" but no information is provided to show when he otherwise demanded a speedy trial or asserted this right. In short, other than relates to his Motion to Dismiss seeking complete dismissal of the charges against him, the record does not reflect any other assertion by Visintin indicating he actually desired a speedy trial. We therefore conclude that this factor weighs in favor of the State.

The fourth and final Barker factor examines whether the delay has resulted in prejudice to the defendant. Visintin argues that he suffered prejudice by having to post bail three times and by his arrest in Montana. There are three factors considered when determining whether a delay in trial is prejudicial to the defendant, specifically: (1) "oppressive pretrial incarceration[,]" (2) anxiety to the defendant, and (3) impairment of the defense. White, 92 Hawai'i at 204, 990 P.2d at 102.

Visintin was released on bail the same day he was initially arrested, on August 7, 2012. Visintin was also granted bail and released from incarceration after he was arrested in Montana and after he returned to Kaua'i for arraignment. In total, it appears from the record that he was detained in pretrial incarceration approximately three days. We cannot say that he suffered oppressive pretrial incarceration.

As to anxiety to the defendant, "something more than a bare assertion of disquietude is generally required before this form of prejudice will weigh in favor of the accused." Wasson, 76 Hawai'i at 422, 879 P.2d at 527 (citations omitted). "The government will prevail unless the defendant offers objective, contemporaneous evidence of anxiety, such as prompt and persistent assertion of the desire for a speedy trial coupled with a demonstrable basis for the court's believing the delay is

traumatic." State v. Ferraro, 8 Haw. App. 284, 300, 800 P.2d 623, 632 (1990) (citation and internal brackets omitted). Visintin has not offered such evidence here.

Impairment of the defense is the most critical interest considered in determining whether the defendant has been prejudiced. Lau, 78 Hawai'i at 65, 890 P.2d at 302. Impairment of the defense is considered critical "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Wasson, 76 Hawai'i at 421, 879 P.2d at 526 (citation and internal quotation marks omitted). In his appellate briefs, Visintin does not claim any specific impairment to his defense due to trial delay. In his Motion to Dismiss, he asserted that he was "prejudiced because memories have faded and even police witnesses who 'searched the area for criminal activity with negative results' have apparently retired." However, the Hawai'i Supreme Court has endorsed the proposition that the "possibility of prejudice is not sufficient to support [defendants'] position that their speedy trial rights were violated." Lau, 78 Hawai'i at 65, 890 P.2d at 302 (citation omitted). Further, in addressing alleged pre-indictment delays, the U.S. Supreme Court has concluded that the possibility "that memories will dim, witnesses become inaccessible, and evidence be lost" are inherent in any delay, limited by the applicable statute of limitations, and thus "not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment." Marion, 404 U.S. at 325-26; State v. Dunphy, 71 Haw. 537, 542, 797 P.2d 1312, 1315 (1990) (holding that "a mere claim of loss of memory coupled with a lapse of time does not, of itself, establish prejudice") (citations omitted).

Visintin also notes that the length of the delay in bringing him to trial is considered presumptively prejudicial. While the Barker test requires the court to determine whether the length of the delay was sufficient to render it presumptively prejudicial as to trigger consideration of the other factors, the

fact that a delay is classified as presumptively prejudicial, by itself, does not mean that it is considered prejudicial for purposes of the fourth factor, unless it is so "exceedingly long" as to create a "strong presumption of prejudice[.]" Lau, 78 Hawai'i at 65, 890 P.2d at 302.  The twelve month period involved in this case does not constitute such an exceedingly long delay.

Accordingly, we conclude that Visintin was not denied his constitutional speedy trial right.

### 3.    Excessive Bail

Visintin argues that the State's practice of seeking and obtaining multiple postings of bail in this case, especially without disclosing to the circuit court the initial posting of bail when the State sought a second bail, violated the Eighth Amendment of the United States Constitution and article I, section 12 of the Hawaii Constitution.  Visintin claims that the circuit court thus should have granted his Motion to Dismiss based on a violation of his right against excessive bail.

Visintin cites to cases that generally address the purpose of bail and the proposition that bail entails an ongoing "custody of the law."  See e.g. U.S. v. Holmes, 452 F.2d 249, 261 n.11 (7th Cir. 1971).  However, Visintin cites no authority for the proposition that where a person's right against excessive bail is violated, he or she is entitled to dismissal of criminal charges.  To the contrary, we conclude there is no independent basis for dismissing the criminal charges against Visintin based on his claim of excessive bail.  See People v. Standish, 135 P.3d 32, 48 (Cal. 2006) ("We have not discovered any authority suggesting that the remedy, when excessive bail has been set prior to the preliminary examination, is an order setting aside the information.  Rather, it is settled that defendants may correct error in the setting of bail by seeking a writ of habeas corpus or other extraordinary writ ordering reconsideration of custody status or release."); cf. State v. Johnson, 980 S.W.2d 414, 421 (Tenn.Crim.App. 1998) (holding that failure of the trial court to set bond did not give rise to a dismissal of the indictment).

Visintin also makes a brief argument to the effect that the State should not be allowed to toll the time under HRPP Rule 48 given the handling of bail in this case. We have already addressed the implications of the bail setting for purposes of HRPP Rule 48 in section III.A.1 above.

## B.    Motion to Suppress

Visintin next alleges that the circuit court erred in denying his Motion to Suppress. Visintin specifically argues that Officer Silva lacked "any reasonable articulable suspicion of unlawful activity[,]" which would entitle him to stop Visintin. Furthermore, Visintin claims that "even if the initial stop was constitutionally justified, the immediate demand for identification was not." The primary cases Visintin relies upon are State v. Dawson, 120 Hawai'i 363, 205 P.3d 628 (App. 2009) and State v. Silva, 91 Hawai'i 80, 979 P.2d 1106 (1999). We view these as unconvincing in light of the circumstances of this case. Therefore, as to Visintin's arguments regarding his Motion to Suppress, we disagree. Officer Silva's observations provided a reasonable basis for him to stop and investigate Visintin's conduct, and his request for identification was justified and within the scope of this initial stop. Accordingly, we affirm the circuit court's denial of the Motion to Suppress.

As an initial matter, we must "determine when, if at all, a 'seizure' in the constitutional sense occurred during the encounter" so as to trigger the protections of the Fourth Amendment of the United States Constitution and article I, section 7 of the Hawai'i Constitution. State v. Kearns, 75 Haw. 558, 566, 867 P.2d 903, 907 (1994). "[A] person is seized if, given the totality of the circumstances, a reasonable person would have believed that he or she was not free to leave." Id. We conclude that Visintin was seized when Officer Silva approached him, ordered him to come out from the bush, and requested identification.

The Fourth Amendment's prohibition on unreasonable seizures "applies to all seizures of the person including brief

investigatory stops." State v. Koanui, 3 Haw. App. 255, 257, 649 P.2d 385, 387 (1982). Furthermore, "[a] warrantless seizure is presumed invalid unless and until the prosecution proves that the seizure falls within a well-recognized and narrowly defined exception to the warrant requirement." Eleneki, 106 Hawai'i at 180, 102 P.3d at 1078 (citation, internal quotation marks, and ellipses points omitted). Visintin was seized without a warrant.

Among the exceptions permitting a warrantless seizure,

police may temporarily seize or detain an individual to investigate possible criminal behavior based on reasonable suspicion, even if there is no probable cause for an arrest. To justify an investigative detention under the reasonable suspicion standard, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.

Dawson, 120 Hawai'i at 369, 205 P.3d at 634 (internal citations and quotation marks omitted). In determining whether reasonable suspicion supported an investigative stop, the "ultimate test . . . must be whether from these facts, measured by an objective standard, a man of reasonable caution would be warranted in believing that criminal activity was afoot and that the action taken was appropriate." State v. Perez, 111 Hawai'i 392, 398, 141 P.3d 1039, 1045 (2006). Examining "the totality of the circumstances[,]" Spillner, 116 Hawai'i at 357, 173 P.3d at 504, we conclude that Officer Silva testified to sufficient articulable facts providing an objective basis to believe that criminal activity was afoot and justifying Visintin's temporary seizure.

Although Officer Silva was not responding to a crime at the time of the incident, he stated that there had been multiple burglaries in the area prior to that date. As such, Officer Silva had grounds to be suspicious when he observed a figure running across the highway at approximately 2:40 AM. Officer Silva stated that his suspicions were further aroused by the fact that Visintin ran, rather than walked across the highway, and by the fact that Visintin's entry onto the Friendship House's property might constitute a potential trespass, since he believed the building was closed. Additionally, when Officer Silva

activated his spotlight, he observed Visintin "hiding in the bushes."[17]  Given these factors, Officer Silva had an objective basis to believe criminal activity was afoot warranting an investigative stop, and we agree with the circuit court that these facts, taken together, provided reasonable suspicion for Officer Silva's actions.  Dawson, 120 Hawai'i at 374-75, 205 P.3d at 639-40 ("Neither the fourth amendment nor the Hawai'i Constitution 'require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape.  On the contrary, . . . it may be the essence of good police work to adopt an intermediate response.'" (internal quotation marks omitted)).

Visintin next argues that, "even if the initial stop was constitutionally justified, the immediate demand for identification was not[,]" and that Officer Silva's demand for identification went beyond any legitimate investigatory purpose of the initial stop.  Visintin is correct that even where a seizure was justified at its inception, it may become impermissible where it exceeds the "scope [of] the circumstances which justified the interference in the first place[.]"  Estabillio, 121 Hawai'i at 270, 218 P.3d at 758.  To this end, an investigative stop must not be "stretched so far as to allow detentive stops for generalized criminal inquiries[,]" Eleneki, 106 Hawai'i at 183, 102 P.3d at 1081, must be "no greater in intensity than absolutely necessary under the circumstances[,]" State v. Barros, 98 Hawai'i 337, 342, 48 P.3d 584, 589

---

[17]  Below and on appeal, Visintin argues that his conduct of crouching in the bushes was not incriminating behavior furnishing reasonable suspicion but rather a natural response to having a bright spotlight of unknown origin directed at him.  However, in its ruling, the circuit court found that Visintin was indeed "hiding" in bushes, and Visintin's explanation alone is insufficient to prove this finding clearly erroneous.  Dan v. State, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994).  Moreover, when accompanied by "other, more probative grounds for reasonable suspicion," "nervous, evasive behavior can be a pertinent factor in determining reasonable suspicion[.]" Estabillio, 121 Hawai'i at 274, 218 P.3d at 762 (internal citations and quotation marks omitted); see also Koanui, 3 Haw. App. at 258, 649 P.2d at 387-88.  Therefore, we disagree with Visintin's argument that his conduct did not contribute to reasonable suspicion of criminal activity.

(2002)(citation omitted), and must "last no longer than is necessary to effectuate the purpose of the detention--*i.e.*, transpire for no longer than necessary to confirm or dispel the officer's reasonable suspicion that criminal activity is afoot." Estabillio, 121 Hawai'i at 270, 218 P.3d at 758 (citation omitted). We hold that Officer Silva's request for identification did not cause Visintin's seizure to exceed the scope, intensity, or duration permissible under the circumstances.

Officer Silva testified that his original intent in approaching Visintin was to check out the situation and request identification, and, as noted above, there was reasonable suspicion to briefly detain and investigate, in particular because Visintin appeared to be trespassing on the Friendship House property at 2:40 AM and was hiding in the bushes. After stopping Visintin and ordering him out of the bushes, Officer Silva noted that Visintin was breathing heavily, sweating profusely, and smelled of alcohol, factors that provided additional suspicion for him to investigate. Identifying the detained person may be a reasonable and natural step in attempting to confirm or dispel the suspicion that prompted the investigatory stop. State v. Melear, 63 Haw. 488, 493, 630 P.2d 619, 624 (1981) ("A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at that time.")(citation omitted); State v. Silva, 91 Hawai'i 111, 118, 979 P.2d 1137, 1144 (App. 1999)(noting that a common investigative technique is "interrogation, which may include both a request for identification and inquiry concerning the suspicious conduct of the person detained").

It is true that Officer Silva testified that one of the things he intended to do with Visintin's identification was to run a warrant check. While the Hawai'i Supreme Court has noted that police may not prolong the detention of individuals

subjected to brief, temporary investigative stops solely for the purpose of performing a check for outstanding warrants, Barros, 98 Hawaiʻi at 342, 48 P.3d at 589, there is no indication that this occurred here. Officer Silva's testimony indicates that the request for identification was his first communication after ordering Visintin to come out of the bushes, and there is no indication that he prolonged Visintin's seizure in order to conduct a warrant check. Rather, the request for identification was within the scope of Officer Silva's initial investigation to address his reasonable suspicion of criminal activity.

In sum, the circuit court did not err in denying Visintin's Motion to Suppress.

## IV. Conclusion

For the reasons set forth above, we vacate the Judgment entered on January 30, 2014, and remand the case to the circuit court for dismissal pursuant to HRPP Rule 48. On remand, the circuit court shall determine whether the dismissal should be with or without prejudice.

On the briefs:

Daniel G. Hempey,
for Defendant-Appellant.

Tracy Murakami,
Deputy Prosecuting Attorney,
Office of the Prosecuting Attorney,
for Plaintiff-Appellee.